[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISIONBEFORE:
APPEARANCES:
FOR THE PLAINTIFF: CT Page 1425-cr
 Barbara J. Ruhe, Esq. 415 Silas Dean Highway Wethersfield, CT 06109
FOR THE MINOR CHILDREN:
 Frank G. Santy, Esq. Berger Santy, P.C. P.O. Box 1163 Enfield, CT 06083-1163
 Kathleen Garthwaite Court Recording Monitor One Court Street Micidletown, CT 06457
THE COURT: The Court has this matter on referral from the Judicial District of Hartford. The Court has before it four motions, two motions filed by Mr. Landers, who is the defendant in the original proceedings. Both of them are motions to modify in regard to issues of custody. One dated July 7th and filed July 8th, the other dated July 7 and filed July 14 pursuant to the practice book rules, but those are of 1997. The record should be clear on that.
Pursuant to the rules, the motions state, in their body, the reason for seeking the modification. A substantial change of circumstances is alleged in the first motion based upon allegations of Ms. Burns, formerly Ms. Landers, filing false and malicious complaints.
In the second motion embracing that and also indicating an assertion that it is in the best interest of the minor children that these modifications occur. In both motions Mr. Landers seeks sole custody of the two minor children and supervised visitation to Ms. Burns.
Ms. Burns also pursues before the Court, a motion for contempt regarding financial orders of the Court. The motion for contempt is dated August 11th and filed August 16th of 1999 claiming failure to pay, by Mr. Landers, certain child support and child support related orders regarding health insurance premiums and health expenditures for the minor children that are not covered by health insurance.
Mr. Santy, also, as attorney for the minor children, has filed a motion for counsel fees post judgment dated January 11th. Before I forget, I am CT Page 1425-cs going to deal with that motion first. In support of that motion, Attorney Santy has submitted an affidavit, with attached invoice, seeking the payment of $8585. It is based upon an hourly rate of $190 per hour.
The Court finds the hourly rate and the fees charged, given the complexity of the matter, the area in which it is tried, the geographic area and fees common in the area and the services provided, that the bill is, frankly, more than reasonable. The hourly rate is probably far below that which many counsel in the area charge.
The Court approves the request for counsel fees and is going to order that each party, having examined the financial affidavits of the parties, that each party pay one half of that bill within — not within 30 days — on or before February 25, 2000 by 5 p.m., by good funds. I think you will find that is a Friday, if you look at a calendar. The reason for using that date will become more apparent as time goes by.
The children at issue here are Thomas, who is affectionately known as Tommy) and Caitlin. Tommy was born March 25, 1990. Caitlin was born August 27, 1992. Tommy is therefore, nine, almost 10 and Caitlin is 7.
These parties were divorced on October 21, 1996. In the judgment, which was pursuant to an agreement between the parties, there was a provision that these parents would share joint legal custody of their minor children. Indicative of some of the problems that had existed and swirled around their separation, separation issues and were ongoing, there were provisions in regard to a variety of issues, including the provision for a mediator to assist on the caregiver issues as provided for in the judgment.
These children have lived, Caitlin, virtually all of her life and Tommy, since he was two years old, as children of an acrimonious divorce; acrimonious post divorce litigation and a relationship between the parents that has no redeeming characteristics.
This Court notes that these children have not had any significant respite in their lives from the litigation. There are 91 filing entries in this file. This is for a family that has never had, in the grand scheme of things, significant asset acquisition to fight over. Most of the fight has been around issues that are child focused or child affected.
This, as Mr. Landers has said, is going to stop. It has to stop for CT Page 1425-ct these children. The problem for the parties is that, regarding the mechanisms provided by the expert and by counsel, this Court has absolutely no confidence that any of them will stop this litigation for the children. Therefore, the Court will pursue other remedies.
Both parties have harmed their children through their mutual warfare. Ms. Burns' faux pas, errors, willful conduct and at times, reckless conduct has been made clear to the Court through this proceeding. She has not been involved in this alone. She has had the tacit support, acquiescence and assent of her parents.
This family unit has had trouble forgiving. The person that they have had trouble forgiving is Mr. Landers. The unfortunate victims of this hard-heartartedness are the children. Tom Landers is the dad of Tommy and Caitlin.
Children have a right to love their parents unconditionally and free from the stress, anxiety and acrimony that has surrounded the lives of Tommy and Caitlin's parents. Tommy and Caitlin have not been allowed, in either instance, and I'll go into the other hand in a moment, to grow up with the security of their love of both of their parents because it's been undermined in each case by the other parent and by the grandparents.
This is a most unfortunate decision because, especially coming off the juvenile court and spending years in the family court, I find I spend most of my time praising grandparents because of the role they take. The silent presence of the grandparents in this family and in this court throughout these proceedings may be construed to have been in support of their children, but there is a term called enabling. Mr. Santy inferred it. These parents' parents, the grandparents, have enabled their children to continue the battle.
They themselves have been placed from time to time as surrogates, taking on care taking roles. While that can be good for the children, it can be bad when it comes with the same poison that the parents have held towards each other.
I don't know how the Burns family will find it in their heart to forgive Mr. Landers for their perception of the altercation between him and Ms. Burns, but it is absolutely essential for Caitlin and Tommy that it occurs.
I don't know how Mr. Landers' parents are going to find it in their CT Page 1425-cu heart to perceive that they too must forgive the Burns family for the allegations against Tom, for what they see clearly as his financial demise as a result of his relationship with them.
All these things came through as undercurrents in the trial. Very tangentially, but they're fed day in and day out in your households.
Tommy and Caitlin need there to be a wholesale, family-by-family, individual-by-individual growth past this conflict. Unless each one of you engage in that process, I assure you that Attorney Santy is right. These children, who have so much promise, will live tortured lives as adults, and, frankly, you'll have no one to thank but yourselves.
It's not the caregivers, like the doctors and the therapists, it's you folks, who have such influence on these children because they love you so much and expect you to do the simplest things in life and that is to live the values that you want them to have. That is what you have not been doing, not in regard to these children.
The brief hiatus of about six months that Mr. Landers told us about where there was a mood, an environment which suggested that there was a possibility that joint custody, co-parenting could work, did not last long, as he indicates.
The 1997 June incident, Mr. Landers tells us, is the straw that broke the camel's back. That may be so, but that is equally unacceptable. There is no doubt that the conduct of Ms. Burns in regard to that incident is subject to condemnation, inappropriately wrong and was part of a chain of conduct that occurred previously.
Probably, the best thing that ever happened in this matter, in regard to that, was that she was arrested. If that's not a wake up call, I don't know what is. It provided Ms. Burns the opportunity to reflect upon the implications of the involvement of police, DCF and the like in the lives of these children.
Maybe it was done for personal reasons, because she felt wrongfully arrested, but the net effect was that when she felt at risk, the risk to the children became more clear, perhaps out of self preservation, but the end result was that for two and a half years, indeed, there has been no further incidents, no further reporting, no further problems of this kind.
Now, the Court is aware that Ms. Burns has inferred that it is because CT Page 1425-cv the kids are older, they can speak their minds and they can protect themselves as if something had happened all the while, although no charges had ever been substantiated. It's not the right reason.
The Court more likely believes that there had been no further problems on that front because of the risk that Ms. Burns herself faced, and because Mr. Landers did put the custody of the children at risk to her through these proceedings.
However, things have improved in the last year for the children. Ms. Burns has had the opportunity to see the benefit of the counseling for the children and see the benefit for the children of relatively lower level of conflict because of the lack of outside investigators, such as DCF and police.
Mr. Landers, on the other hand, cannot forgive her for the various assertions that have been made against him in regard to the children. He has had two and a half years to stop this process. He has had two and a half years to decide that this process was not good for the children, that the parties could find a way to co-parent and to stop this constant parental litigation.
The Court believes and finds that Mr. Landers is motivated by his anger in this litigation, and that it is a primary motivation, and he is seeking vindication because of the allegations he has felt so wrongfully charged of.
This litigation has been financed on the back of the children. The Court finds it outrageous that up to and probably exceeding $200,000 has been spent on funding various aspects and tangential aspects of this litigation.
During the period of time that Mr. Landers utilized his own resources and implored his family to support him or receive their support even voluntarily in this litigation for the last two and a half years, he has not paid child support since November 1997. He has, therefore, funded the litigation at the risk of under funding the financial need of these children.
Also, this has made Ms. Burns more dependant on her parents than she might otherwise have been. This has prevented her, in some respect, from being able to assert her own independence, which would be healthy for herself and for her children. It becomes a power issue at a certain point. CT Page 1425-cw
Mr. Landers wants the children to go to St. Bridget. He's not paid for Caitlin this year, but he has paid for the litigation. Mr. Landers is critical of Ms. Burns' care of the children and says he can do a better job, but he's not paid his child support to help her caretake the children. Mr. Landers okayed the trumpet, but didn't pay his share. Mr. Landers wants his children healthy, but he doesn't contribute to the health insurance premiums.
Mr. Landers wants me to listen to what he says and not see what he does. There is an expression, he talks the talk, but he does not walk the walk, of a concerned parent.
The personality characteristics from the psychological testing that Dr. Mantell has done, perhaps can help explain some of the behavior of these parents. Ms. Burns has defensive qualities, which makes it difficult for her to, necessarily, be able to hear Mr. Landers as he intends to be heard when they talk about the children. She is, in a sense, too busy protecting herself and insulating herself from his words.
Ms. Burns has suffered some depression and will continue to do so, but it's no surprise. She has two troubled and, occasionally, very hard to manage children. She has invested in a career that appears, at the present time, to have been sacrificed voluntarily to invest herself in her children and in this defense of this litigation.
Mr. Landers is defensive as well, so he may not necessarily hear Ms. Burns as she intends to be heard when they attempt to "communicate. He's too busy protecting himself from her words as she may have intended them to be spoken. He also has a narcissistic quality and is an independent decision maker, wanting to make decisions on his own. These are neither good nor bad qualities. They're simply qualities, but it makes it harder for him to hear Ms. Burns' voice and co-parent.
It is probable that these personality characteristics are consistent with some of the honesty I heard from the parents. Mr. Landers says they can't co-parent. Ms. Burns says they can some of the time, but not all the time.
Where the interaction between the parties is not agreeable, there is conflict. Their defensive mechanisms take over and the children are the losers, because the parties cannot get past their own inherent, self-limiting characteristics to hear each other. They've developed. CT Page 1425-cx historical basis since 1992 of functioning this way.
Tommy's problems were a large centerpiece of this litigation. This Court cannot find, based upon the testimony, whether Tommy's issues are a result of this litigation alone or result of some organic problem that has not yet been diagnosed or a result of some other emotional problems that are unrelated to the dissolution or some kind of hybrid. There is simply inadequate evidence before the Court for the Court to point to any one source for Tommy's issues.
He is clearly an endearing child, who is sometimes hard to manage. His teachers' testimony was exquisite about Tommy. The different testimony from his three teachers, as he has gone through his now two and a half years with them, was exquisite.
Tommy struggles, it is clear to the Court, to always do the right thing and be in the right place at the right time and be properly diffident and respectful to adults and others. His struggling has been the focal point of which parent can better parent him, rather than finding a way to unify his parents to help Tommy direct himself and help diminish his impulsive characteristics and his wandering, his mental wandering characteristics.
Caitlin's problems are just beginning to emerge. They are clearly milder, although she can act out as well. The Court notes it is easy to conclude that she has Tommy as an example before her day in and day out. They are siblings.
The Court finds that the relationship is very strong. It is both very positive and very negative. They do communicate They care about each other. They're ever present and aware of each other and they play together. They also fight together at each other's instigation, not necessarily just one.
Tommy frightens Caitlin sometimes. They hurt each other sometimes. In the face of their parents, however, and the modeling their parents have created for each other, their behavior is not surprising to the Court.
This Court is concerned how it could possibly separate these children and provide, yet, one more loss for these children. They each have fragile emotional bases. They need to be free from any further guilt. They need a reduction of their competition, but there is no evidence before this Court, even Dr. Mantell's testimony, that their separation during the school week will result in a reduction in the competition. It is sort of a pie in the sky hope. On the flip side of it was the equal CT Page 1425-cy probability that it would make them more competitive.
The other reason suggested that the Court should split these children on that school schedule basis is that it would provide more parental energy and a schedule to allow for a respite. The present schedule allows each parent a respite for the other when the children are with the other parents.
The weekend is valuable time, both when you have your children and when you don't have your children. In the face of parents who so poorly communicate, this Court is concerned that to separate these children will result in a handing down of that poor communication of the parents to the children with each other.
Insufficient opportunities are available at the school for the children to see each other on a daily basis. They don't stay in the same recess. They don't see each other in the hall other than the quick passing from class to class. Therefore, they would miss the opportunity for each other's counsel, friendship and comfort while each is dealing with the stress of their parents and that life gives them in general.
This is not a risk that the Court is willing to Take for these children after they have lived for so many years with such conflict by their parents and grandparents. Each parent much remain vigilant in regard to the children's schoolwork. The children are used to the access schedule, the physical presence as it exists right now and have come to expect that they will be where they are, when they are. There is no reason for the Court to disturb that at the present time.
The Court does not desire, in these orders, to create any sense for the children that the children have caused any harm to themselves or to their parents. The Court notes, for purposes of these orders, that the parents have agreed that the children will be raised Roman Catholic and will meet their obligations as children who are raised Roman Catholic.
The Court notes that these children have been acting up more recently, particularly Tommy, in December, with the knowledge that the court conflict is coming to an apex and hopefully a conclusion.
The Court finds that the utilization of a family manager will only be one more strategy to prolong the effort by outside forces to impose co-parenting to parents who don't co-parent.
The Court specifically finds that joint legal custody and joint CT Page 1425-cz physical custody is not in these children's best interest. These parents have been unsuccessful since their attempts to do so since the judgment in 1996. At least in the last 2 years there has been no outside intervening event to prevent these parents from finding a way to co-parent.
The hostility remains. It has not abated. Mr. Landers has an absolute inability to get over the hostility for the benefit of the children.
This trial is not intended, in its result, to vindicate either parent. It is intended, in its result, to end the conflict for these children, as I'm implored to do.
Mr. Landers asked me to put the children with him because he feels he provides a more secure type schedule and regularity and discipline for the children. This is said without knowing what the schedule is for the children in the home of Ms. Burns.
It is clear to the Court that since the children have been in counseling with Dr. Christiana, there has been reasonable progress in Tommy's behavior and some abatement in the conflict between the children.
Ms. Burns has been, in these last 2 1/2 years, consistent in her concern for the children. There is no reason to doubt that that will alter. In saying this, the Court does not, however — these orders do not provide an endorsement of the problems that she has historically created in this relationship. It's simply an indication that she has demonstrated an ability for the benefit of both herself and the children to grow past the conflict between these parents. The children have been the beneficiary's of her ability to grow past the conflict.
The Court orders sole custody of the minor children to the mother. The father's schedule of visitation shall remain as it is presently, without alteration. Ms. Burns shall provide Mr. Landers timely notice, as she receives it, of the children's school and extracurricular activities to which parents are invited, so that Mr. Landers can timely attend those events. She shall provide timely copies to Mr. Landers of report cards and midterm reports. She shall provide him immediate notice of any health problems of the children as they emerge beyond the most routine colds.
Because these children are being raised by the parents Roman Catholic, and the children have an expectation from the church to meet certain requirements so they may make their Communion events, confirmation events CT Page 1425-da and the like, each parent shall take the children to mass weekly and to religious education as it may come to be scheduled outside the parameters of school from time to time. If for any reason Mr. Landers, or his family cannot take the children to mass on any given week, he shall return them to Ms. Burns' home by Saturday at 4 p.m. and give her notice on the Friday before.
If the children have events that are scheduled during Mr. Landers' visitation time, whether it's dance, sports, scouting or the like, one of the roles and wonderful roles of parenting, is taking the children to their events and enjoying experiencing them with them, and Mr. Landers shall do so, if the events emerge during the time with his children.
These orders are intended to replace and supplant all of the custody access and consultation orders in regard to the judgment.
Ordering sole custody is a last choice for the Court, typically, because our law presumes that joint legal custody is in the best interest of children.
The Court agrees with Mr. Landers, absolutely, that this conflict must end. It is parental conflict. It is not children conflict. The children have historically resided primarily with Ms. Burns. There is nothing before the Court to suggest that that should alter and that the children's balance that they have come to rely and depend upon should be altered.
There is nothing before the Court to suggest that in the last 2 1/2 years Ms. Burns has been inappropriate in her decision making as a parent for these children. Mr. Landers, while he cares terribly about his children, remains consumed by the wrongs that have been committed upon him and therefore, cannot see past them to the benefit of the children.
The fact remains that Tommy and Caitlin have two parents, and these orders assume that Ms. Burns will continue to respect the role of Mr. Landers as a caring parent, but she shall be the decision maker so that these children are no longer stuck in the power and control conflict between these parents.
Moving on to the contempt motion, the Court finds that Mr. Landers knew what the orders were of $100 per week child support since the date of the judgment and knew of the orders regarding the sharing of health insurance premium costs and medical expense costs for those items not paid by health insurance. CT Page 1425-db
The Court finds that Mr. Landers had an ability to pay these sums and has a present ability to be paying the current orders, but has made a choice, rather than to pay these sums, to finance the litigation and make other discretionary expenditures rather than pay his child support.
He has not, even on times where times might have been a little tougher than others, attempted to pay his child support at all since November 1997. Not even partial payments have been made.
The Court finds that Mr. Landers has been in flagrant, obnoxious and offensive contempt of Court. Even when ordered to pay a token sum of $1000 against a large arrearage by the Court specifically, he failed to do so.
The Court finds the following arrearage:
The Court has reviewed Ms. Burns' records which claim the total arrearage is laid out in plaintiff's exhibit II for $23,225.45 as a combined amount.
The Court rejects the following claims by her: the Court reduces the arrearages claimed by her for Child Guidance Clinic by $70 which is one half of the total expenditure of the $140 and the expenditure for Dr. Haymes by one half of $786.25. These two sums are reduced, the Child Guidance clinic because the record discloses, unrebutted from the evidence that Mr. Landers was paying equal sums, and therefore, these were sums that she should have totally absorbed.
As to Dr. Haymes, at the time that the expenditures were incurred for Dr. Haymes, Ms. Burns had knowledge that the judgment required her to go through a process before referring the children to Dr. Haymes. It would be inequitable under the terms of the judgment, to include those sums in an arrearage claim.
Therefore, the amount claimed is reduced by $856.25. Counsel has requested counsel fees in the amount of $1000 for five hours at the rate of $200 per hour. No issue was taken with that, and the sum was not contested and therefore, is granted.
Mr. Landers has told the Court that he wished to proceed without counsel, as long as I gave him a period of time to pay the sum, even though he was at risk of incarceration. The Court, therefore, enters the following orders: CT Page 1425-dc
The Court commits, having found the contempt to be flagrant, continuous, obnoxious and offensive and totally within his control to pay as it came due, the Court commits Mr. Landers to the custody of the commissioner of corrections with the commitment stayed as long as Mr. Landers meets the following condition: that he pays the entire arrearage on or before February 25th at 5 p.m. by good funds, which are bank check, money order or certified funds to Attorney Ruhe's office by 5 p.m. If he fails to do so, or if there is a dispute as to the wholesomeness of the payment, all parties are due back here the following Monday, February 28th at 9:30 in the morning.
The arrearage, for the record, after the reduction of Haymes and Child Guidance for unpaid child support, unpaid medical expenses and unpaid medical insurance premiums is $22,369.20. That, plus the $1000 attorney's fees is due on or before February 25th as indicated. The Court will remind the parties that Attorney Santy's fees are due at the same time.
Now, supplemental to that, Mr. Landers, these orders take you through January 18th. You are to remain current in your child support. If you are not current as of February 25th, you must appear before this Court on February 28th at 9:30.
The judgment provides that if Mr. Landers is current in his child support, he can collect the dependency, assert the dependency exemption for Caitlin. The Court construes those orders in regard to the year 1999. At no time in the calendar year 1999 has Mr. Landers been current in his child support. But for these coercive orders of the Court, he would not be current. He is, therefore, not entitled to claim Caitlin as a dependency exemption for calendar year 1999. Provided you make current your child support, as indicated in the judgment, as of February 25th and thereafter keep it current, then you'll be entitled to Caitlin for 2000.
Child support is not an economic power tool between parents. Child support is to buy the basic necessities for children to live. It is not one parent's sole obligation to support children. It is a mutual obligation. The sum of $100 per week does not even begin to pay the necessary shelter, clothing and associated expenditures for children.
The deprivation to Tommy and Caitlin of child support for these many years has been used as an economic power tool to fund this litigation, to make financial life for Ms. Burns more difficult, and unfortunately, to make her more dependant upon her parents.
Dr. Mantell noted that we used to have three generational homes all the CT Page 1425-dd time, and we did, and lots of healthy generations grew up that way. This Court is, however, concerned that both of these homes, being three generational homes and neither parent in a significant way employed to their fullest potential, that beside your parenting issues of hands on parenting, that these children are not necessarily being provided the best role models of parents as parents of adults as to how they're going to need to function in society.
It is not an easy world out there. These children need to learn something other than dependency behavior. would implore the grandparents and the parents to think about that.
Does anyone think I messed up on dates?
Attorney Ruhe: No, Your Honor. I just had a practical question. If Mr. Landers is required to pay the child support arrearage by February 25 at 5:00, it may not be possible to give Mr. Santy a check with wholesome funds by February 25th at 5:00.
THE COURT: I am presuming that if you, as counsel, call him and tell him that you have a check that you will be able to accomplish it. Unfortunately, it's Mr. Landers who is going to have to do the running around that day if it's a last minute basis.
Attorney Ruhe: Mr. Santy and I have a very positive relationship and we can work that out.
THE COURT: It's my calendar, and I'll tell you folks I never carry financial orders on my calendar. This case has been around for too long and it needs to be over in every respect. These kids need normalcy, so I'll carry it this once. What somebody needs to do is to leave a message for Attorney Carey on our machine as to whether I'll be hearing it on the 28th
The orders, I know, Mr. Landers, that these orders are not what you expected. I know they seem severe.
They're not meant to disinclude you in the children's lives. They're meant to end the conflict between the two of you because it is so very, very bad for these children.
I try custody cases here day in and day out. You folks have no idea what this docket is like over a 52 week period. I am, in the grand scheme of things, very worried about your children. Both of you have got to CT Page 1425-de figure this out. It's getting to be too late. Probably a good beginning would be that when I walk out of this room, and I'll never know what happens — again, if you wake up a little bit, just for a minute and stand up and shake hands and figure out how you are going to start talking to each other. Even with sole custody, you're still going to need to talk, because he's dad and you're mom, and that fact never charges. Good luck to you.
Munro, J.